**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------

**UNITED STATES OF AMERICA**

       - against -                         18-cr-662 (JGK)

**MICHAEL JONES,**                                  <u>ORDER</u>

                    **Defendant.**
------------------------------------------------

**JOHN G. KOELTL, District Judge:**

    The Court has received the attached victim impact letter. The parties should assure that any sentencing letters to the Court are submitted through counsel and not directly to the Court.

**SO ORDERED.**

**Dated:    New York, New York**
           **December 9, 2019**              /s/ John G. Koeltl
                                                      **John G. Koeltl**
                                       **United States District Judge**

Judge John G. Koeltl
Courtroom 14A
500 Pearl Street
New York, New York 10007



Re: United States of America v. Michael Jones;
Case No. 1:18-cr-662-JGK;
Victim Letter re Sentencing

Dear Judge Koeltl,

We hope you had a restful Thanksgiving with family and friends, and have a joyous holiday season. For us, the holidays – the second anniversary of Diana's death – are bittersweet, of course, but we are doing our best to reestablish a normal life. Loss of a child – especially in such a horrific way – is worse than anyone who hasn't had such a loss can possibly imagine.

The jury has decided on the case of United States versus Michael Jones. He is guilty of distributing heroin, fentanyl and furanylfentanyl to Diana; these opioids contributed to her death; but his drugs were not the but-for cause of her death. Needless to say, we were devastated that the jury concluded that the man who – in their judgment – gave Diana heroin, fentanyl and furanylfentanyl – none of which she'd ever experienced – was not the but-for cause of her death. I do not understand how one can reasonably conclude the former, and not the latter.

That said, I know that there is no way to revisit their decision.

I'm not vindictive, and I do believe in rehabilitation and redemption. However, the defendant knows no other way to make a living, and will very likely resume dealing his trademark super-concentrated heroin & fentanyl as soon as he's released. It's only a matter of time before he kills someone else with his toxic product. This letter is about protecting society from someone who *proudly* distributes ultra-potent opioids, even after someone has died from his product.

I know Diana, and know some of the evidence that the jury did not see. Michael Jones – the self-styled "Real New Jerzey Devil" – killed our daughter, Diana Haikova. I say this with complete confidence, for reasons that I'll outline shortly.

We understand that sentencing is based on a "preponderance of the evidence," and respectfully request that he be taken off the streets for a long enough time that it would be difficult for him to reestablish his contacts and resume a career of trafficking some of the most concentrated and lethal doses of opioids that money can buy. We can only hope that this man is not let loose on his community soon enough to resume his chosen profession.

Let me address a few topics that may be relevant to sentencing.

- **Who was Diana Haikova, and what impact did her pointless death have on family, friends and society at large?**

1

- **What evidence was either not shown to the jury or perhaps inadequately considered by the jury?** *This is not a matter of revisiting a decision already made by the jury; that decision is final.* It is relevant because the sentencing is based on a "preponderance of the evidence" standard. The preponderance of the evidence overwhelmingly supports (indeed, in our view, beyond the shadow of a doubt) the lethal effect of Jones's opioids on Diana.

- **What were the "reasonable doubt" arguments by the defense, and how strong are they?** Would *any* of them overcome a "preponderance of the evidence" determination for sentencing?

**Who was Diana Haikova, and what impact did her pointless death have on family, friends and society at large?**

Diana was the only child of my wife, Marina. Marina saw her as daughter, best friend, and very nearly a twin sister, as you can see in the photos below. I had the privilege of knowing her for half of her life, from age 15 to 29, as did my own three children, who were 30, 22 and 20 when Diana died. While Diana was close with all three, my daughter Sydney felt a special close bond to Diana, again evident in the photos.




2



As I said earlier, we taught her too well in some ways, and not well enough in others. We taught her not to pre-judge people, and to embrace new adventures with gusto. We taught her to have a central goal of making the world a better place, in whatever ways aligned best with her passions. As is evident from her last three days, she was wonderfully colorblind in her associations, and trusting to a fault. She once invited a homeless person wandering near our home to join our big annual family Christmas bash; that person turned out to have been a well-known musician some years before, now broke and homeless.

Diana didn't have a filter, as most of us do, regarding who she was willing to consider a friend. Indeed, she trusted people who many educated sophisticates would avoid. *This was a conscious and deliberate part of her effort to make the world a better place.* She was equally at home mingling with CEOs as with rappers, and would "go with the flow" in either milieu. It was one of the most charming things about her.

The world has lost a radiant personality, who gave everyone the benefit of the doubt, and embraced the people and the world around her. The world is a far poorer place for her loss.

Family was massively important to her. She looked forward to having children, but was not yet ready to settle down. A couple of bad relationships left her wary about marriage and commitment. Even so, she loved to meet new people.

I had surgery in 2011, and had major complications that – in retrospect – could easily have killed me. She made a point of visiting for at least a couple of hours every day for my 12 days in intensive care, despite a full-time job. My own three kids merely planned to visit me once I was home (in fairness, I didn't tell them how serious it was). They're good kids, but Diana had the biggest heart of the four. I loved her as my own, and grieve her loss every bit as much as I would have if one of my own flesh and blood had died.








Diana had moved to New York City to advance her career, just 20 days before her death. As a newcomer, she was bored and lonely; she said so in text messages that the jury never saw. An acquaintance (that she'd met only once before) invited her to join some rappers at the funeral for Lil Peep (her texts show that she had no clue who he was, or who the other rappers were, before this excursion). She joked in a text message that these were "thugs" (not her usual crowd), and that one rapper was so loaded on drugs that she feared he might die in her apartment. Sadly, she trusted everyone, until given reason not to. Her attitude was "when in Rome …"



**What evidence was either not shown to the jury or perhaps inadequately considered by the jury?**

Prosecution and defense experts all agree that the opioids provided by Michael Jones were a contributing factor in Diana's death; they only disagree on whether the opioids were the but-for cause of her death. Prosecution and defense both acknowledge that Diana lost consciousness while Michael Jones was at the apartment, that he knew she was unresponsive before he left, and that he did nothing to reach out for help, or to check afterwards whether she was okay.

The *preponderance of the evidence* suggests that Diana was unconscious by roughly 1:30 pm on December 5, 2017. She was probably dead before Jones left her apartment:

- Her phone showed its last movement – one meter – at 1:30 pm on December 5, 2017. Jones left at 2:10 pm. What on earth was he doing in her apartment for those 40 minutes??
- *Not mentioned to the jury:* Diana was a neatnik, exceptionally tidy, as is evident in some of the photos of the apartment. It's inconceivable that she'd leave the bathroom strewn with

tissue paper, as is evident in that one photo. The jury saw this photo but was never told that she was a neatnik, and that this scene was impossible if she'd ever entered the bathroom after the mess was made. Someone was cleaning things – perhaps tidying the body and wiping down counters and doorknobs – in a panicky hurry.
- *Not mentioned to the jury:* Diana was very proud of her appearance; she was a stunner. It's inconceivable that she'd stick tissue in her nose without immediately discarding it once she was done with it. It was presumably put there when she was already unconscious, by someone hastily tidying her (or her body).
- The defense attorney says he is happy to wear the same clothes for five days. Perhaps. Not Diana. She was a fashion hound. She would change for yoga, for school, for work, for dinner, let alone for the next day. After attending an all-night party, it's inconceivable that she wouldn't have showered and changed as soon as Jones left ... *if she was alive to do so*.
- If she was *ever* conscious after 1:30 pm, she'd have tidied the bathroom, showered and changed, cleaned up her nose, not to mention reapplying makeup, doing her hair, etc. Then, she'd have checked her messages, replied to texts, while taking the dogs for an overdue walk. *None of that happened.*
- *Not mentioned to the jury:* William Gabel ("Mackned") said that Jerzey Devil had given him his first-ever heroin in the summer of 2017, which got him addicted. Did Mackned know it was heroin? *No, he "thought it was Molly"* [MDMA/Ecstasy]. If so, Jerzey Devil perhaps has an M.O. of persuading people that they're not taking heroin, possibly to get them hooked, so that they can become new customers? Seems plausible.
- *Never mentioned to the jury:* Jones left through the back door of the apartment building, where there is no doorman, and very little foot traffic. It's an exit-only door, unless you're a tenant with a key. Why didn't he leave the way he came in? Jones was clearly aware that Diana was in trouble; he said as much. He fled out the back, to reduce the chances he'd be seen and connected with what had just happened.
- Did Jones call 911? No. On his way out of town, did he call Diana, to see if she was okay? No. Anyone with an ounce of humanity would have done either or both, if she seemed to be in trouble ... *unless they knew she was dead*. I'm reminded of the old courtroom joke, where the DA says, "we just got word about a surprise witness ... the alleged murder victim is coming into the courtroom momentarily." Then, "please note that the defendant was the only one in the courtroom who didn't turn around to see if she was coming in. I rest my case." Jones made no calls to 911, and no calls to see if she was okay, because she was dying or dead before he left.
- There's an irony here. If he'd called 911 and it was too late, he'd presumably have faced conviction on count 1B. *By not doing the decent and humane thing, by cutting and running, his consequences are actually reduced.* He's getting away with homicide. That's wrong.
- *Not mentioned to the jury:* She had job interviews lined up for the following Wednesday, Thursday and Friday, and lunch set with a friend on Wednesday. So she "went along for the ride" on Sunday, Monday and Tuesday, socializing with an array of rappers she'd never met (she didn't even like rap music ... she was filling time!). The jury never heard about the lunch meeting or job interview on Wednesday where she never appeared ... further evidence that she was already dead well before the ME's estimated time of death.

- *Not fully explored with the jury*: The drop in body temperature, at 1° to 1½° per hour ... is it a linear decline? Or is it more like the half-life of the compounds in her blood? I'm not a doctor, but I know math and physics pretty darned well. If you're half-way to room temperature, shouldn't the cooling of the body be roughly half as fast as initially? Consider the way a cup of coffee cools ... quickly at first, when the temperature difference is large, then more and more slowly, as the temperature approaches room temperature. In this sense, a human body is no different from a cup of coffee. Once you're only a few degrees warmer than the room, shouldn't the cooling become quite slow and gradual?

  This graph illustrates my point. If Diana's body cooled with a half-life of 12 hours, then initially the cooling is 1½° per hour. If the half-life is 18 hours, initial cooling is 1° per hour. If cooling is not linear (and it cannot be linear ... simple physics), then her body being very close to room temperature makes the 1° to 1½° per hour rule unreliable. A half-life of 15 hours – right in the middle of the range – will mean initial cooling is 1¼° per hour and would point to a body temperature of 74° when the MLI arrived.



- One defense expert witness, in a book he wrote 40 years ago, describes unopened mail as evidence of time of death. But, he dismisses an unmoving cellphone, unchanged clothing, and unreturned phone calls and messages, all as irrelevant. He hadn't even bothered to read the Medical Legal Investigator's report from her examination of Diana's body on the

9

previous day. The only basis for his judgment – that the Medical Examiner's report was the conclusive source of the cause of Diana's death – was the Medical Examiner's report itself. *This circular logic was never pointed out to the jury.*
- The other defense expert acknowledges, in a book chapter that he wrote many years ago, that a toxicologist cannot determine the proximate or but-for cause of death. Then he proceeds to pronounce the absence of a but-for cause of death. Both defense experts acknowledge that the time of death is an uncertain estimate. *Neither acknowledges that any evidence uncovered after the autopsy on the 8th has any relevance in reassessing the ME's report.*
- *Not fully explored with the jury:* The Medical Examiner estimated her time of death to be 20-24 hours before she was found. But, the ME described her as having full rigor mortis, and no blotching. The previous afternoon, the MLI described her as having "broken" rigor mortis and blotching, both of which reportedly happen only after a minimum of 24 hours, sometimes considerably longer if she's fully clothed (none of the experts disagreed on this point). So, had she been dead for a longer span when the MLI examined her on December 7, than when the ME performed the autopsy on the 8th?

Much of the trial felt – to us – like a "blame the victim" situation: "just another dead junkie." Diana's sparkle, her infrequent use of drugs, her eagerness for adventure, never entered into the discussion. One of the most important developments in the current opioid epidemic is that *many recovering overdose victims report that they had no idea they were taking opioids*. Diana was no junkie. While Diana's character and her substance habits may not seem relevant to the law in this case, they matter, because they bear directly on the plausibility of the defense arguments.

Diana's use of alcohol and drugs:

- Diana was a heavy social drinker. She could go without alcohol for weeks, when trying to lose weight. But, like her Russian mother and (deceased) father, she could hold her liquor. Hence, no stumbling or other difficulty on her way into the apartment building. She didn't drink daily, but she did occasionally binge drink. According to the NIH, "In 2017, 26.4 percent of people ages 18 or older reported that they engaged in binge drinking in the past month." She had a DUI two years before, and was careful to always use Uber after that, whenever she was drinking. In short, she was hardly perfect, but she was a lovely young woman who occasionally drank to excess. It bears mention that, if the NIH statistics are correct, she drank to excess *less often than* this 26% of the adult population!
- He stomach was empty and her bladder was full when she died. *This means the alcohol consumption was at least several hours before she died.* This is consistent with the party ending at 6 am, the partiers sleeping until 11 am, then Diana walking and Ubering back to her apartment. It's implausible that alcohol consumed seven or eight hours before her death could suddenly kill her, less than an hour after she was walking just fine, unless there was a straw that broke the camel's back ... a but-for cause of death.
- What about her damaged liver? I had the Orange County ME examine the same tissue sample examined by the NYC ME. His comment? *"The microscopic histology of the liver does show what we call macrovesicular steatosis (fat in liver cells). We see this findings in patients in a number of different scenarios including alcohol use, long term medication use*

10

- *from certain types of medications, and in patients with weight challenges. I was not provided ancillary special stains that are typically performed to assist in interpretation of liver scarring (i.e., trichrome and reticulin stains) however there does not appear to be any significant scarring of the liver or distortion of the tissue architecture. Additionally, there does not appear to be any significant inflammation within the liver. Therefore, I do not see any evidence of a chronic injury from any cause. There are significant artifacts in the tissue caused by the post mortem nature of the examination which does somewhat limit detailed interpretation.*"
- I asked a specialist in alcoholism and liver disease to translate the NYC ME and the Orange County ME report on her liver into English for me. "*Steatosis refers to what is called fatty infiltration of the liver which can be cause by a number of things. The most common is being overweight, although it can occur in normal weight people. It can also occur as a result of various drugs/medications or other chemical exposures or medical conditions (see the link below). It is basically excess fat in the liver which can cause a degree of inflammation in the liver, which in a minority of cases over many years can lead to cirrhosis and liver failure. The statements that portal areas are not expanded, there is no Mallory hyaline, and there is no bridging fibrosis indicate that there is not cirrhosis at this point. The slight chronic sinusoidal and postal [this might be a typo ... should read "portal"] inflammation are consistent with the fatty infiltration. Mallory hyaline is sometimes found in alcoholic livers, so its absence is an indication that the findings are likely not related to alcoholism.*"
- She lived with us for the year before moving to New York. As with her apartment in New York, there were no drugs, and no paraphernalia in her room. She never used anything other than alcohol or (rarely) tobacco in our presence. And, she would go off with friends to socialize roughly once a month.
- Diana's friends <u>all</u> told the police and DEA that Diana used drugs socially, including pot at parties a handful of times a year, and cocaine maybe once or twice a year. We strongly disapproved of the latter. But she was an adult, and we knew that she was responsible 99% of the time, and that she never allowed her occasional partying to interfere with work or school. We also knew that cocaine is lethal only in huge quantities or for those with a heart condition. The quantity in her system was acknowledged to be low to moderate. Likewise with the MDMA and Xanax.
- She often said, "I've never used anything stronger than cocaine, and I never will." At our last dinner with her, a Thanksgiving dinner at her favorite NYC Russian restaurant a few days before she died, she told us that she hadn't used cocaine in the previous year. She was always candid with us, because she knew that our love wasn't conditional on these choices, and that – for us – lying was more serious than any misbehavior.
- Of course, if she thinks she's taking cocaine, and it's actually full-strength heroin, taken to the next level with fentanyl, it's like the overdose scene in "Pulp Fiction." But, without the remedy that saved Uma Thurman in the film.
- We took some of her hair as a keepsake; we offered it to the coroner's office for testing drug history, because we were deeply offended at the ME labeling her cause of death as *chronic* and acute substance abuse. They refused the offer. It's still available (the DNA will of course match their tissue samples).

11

- The three expert witnesses all made mention that alcohol, MDMA, cocaine and/or Xanax rarely kill in isolation. They all agreed that opioids can easily kill when used in isolation. This is borne out by Centers for Disease Control (CDC) evidence, with 47,600 overdose victims testing positive for opioids, and at most a tenth as many for other drugs *in the absence of opioids*.

    *2017 Overdose Deaths, with and without Opioids*
    - *Drug*                        *no Opioids*    *with Opioids*
    - *Opioids*                     →               *47,600*
    - *Cocaine*                     *3,811*         *10,131*
        (Applicable ... cocaine was in her system)
    - *Benzodiazapines*             *1,527*         *10,010*
        (Applicable ... Xanax was in her system)
    - *Other Psychostimulants*      *5,130*         *5,203*
        (Not applicable ... none detected)
    - *Antidepressants*             *1,968*         *3,301*
    - (Not applicable .. none detected)

- It would have been interesting to press the defense experts on this. Can opioids kill when used in isolation? Absolutely, especially when used by a novice. Reciprocally, how often do these other drugs kill when used *without opioids*? Rarely.
- Note that MDMA doesn't even rate a mention on the CDC list, above. Dr. Hall said she's never seen an overdose from MDMA in isolation, which means there'd need to be a but-for additional drug.
- Nor, surprisingly, does alcohol appear on the list. While alcohol kills 88,000 people a year, shockingly few die from an alcohol overdose (alcohol poisoning). According to the CDC, "An average of 6 people die of alcohol poisoning each day in the US." That pales relative to the 125 deaths per day from opioids, and is on a par with antidepressants or Xanax. 86,000 of the 88,000 die from accidents (auto, stairs), medical complications (cirrhosis, cancer, heart disease), and so forth, not from overdose.
- Could Diana have been aware she was taking MDMA, alcohol and cocaine? Of course. The evidence supports this. However, each of these rarely kills, *except when combined with opioids ... But-for.*
    - We know for a fact that Diana did not know she was taking Xanax. Her text messages reveal this ... "I took pills *for the first time* [my emphasis] last night ... I can't recall what they were ... I could see how people get addicted ... cause I can't even do Vicodin").
- We're equally sure that she thought the lethal opioid mix was cocaine. It's not remotely plausible that she was asking for heroin, as the defendant claimed in the videotaped police interview. This was never properly explored, although the prosecution did say that she'd never done heroin and the defense never suggested otherwise.
- Speaking of which, why would she mix so many substances? We raised her to always look for the best in people. She was brand new to New York, without a circle of friends. She was

12

trusting to a fault. When partying with friends and acquaintances, she'd party the way they were partying. A stupid mistake that – *once she was given the heroin/fentanyl mix* – had lethal consequences.

The jury wasn't exposed to almost any of this evidence.

Diana was neither an alcoholic nor a druggie, but she did consume alcohol rather too much, and drugs from time to time (but never the really hard stuff). She was open about this with us, but never (apart from a brief stint when she was 20) consumed either alcohol or drugs to an extent that could interfere with her work or her studies, or with her goal of making the world a better place.

**What were the mitigating or "beyond a reasonable doubt" arguments by the defense, and how strong are they? Would *any* of them undermine a "preponderance of the evidence" determination for sentencing?**

None of the defense attorney's alternate scenarios rises to anything approaching "reasonable doubt," let alone "preponderance of the evidence." Here I lay out the defense alternative scenarios, and my counterarguments (further indented).

- *The handyman. Why did he have her key for four hours? Had he ever been arrested? Was he perhaps a drug dealer, too? He remembered seeing Diana facing the window; she was later found facing the door. She msut have been up and about – then lay down facing the other way – between 7 pm on December 5, when the handyman saw her, and the discovery of her body around 1 pm on December 7?*
    - Plausible? No. The handyman also said that he wasn't sure which way she was facing. He saw Diana and immediately left, because he wasn't supposed to be in a room when a tenant is there. He would have had the key during his rounds of errands, which presumably spanned the four hours.
    - That said, I wish he had noticed that she wasn't awakened by her dogs' barking, or his knocking on the door. I have little doubt that she was already dead. The case would have been much more clear-cut if the time of death was pinned down with more precision.
- *Jones put a blanket on her before he left. She was later found without a blanket on her. When did she remove the blanket?*
    - Jones's claim is not corroborated by anyone, in any way. It's implausible that she would have awakened without also showering, changing, walking the dogs, etc.
- *Felicia had an apartment key, which she used to tend to the dogs. Perhaps she let herself in, saw the dead body of one of her best friends, and then coolly stripped the apartment of any evidence of drugs. Once all this was done, she called 911 for a wellness check. Then, when she was told that Diana was dead, according to the apartment manager, she collapsed and screamed. Must have been a good actor.*
    - Plausible? No. You saw Felicia and the apartment manager testify; as early witnesses in the case, their testimony matched perfectly. I understand that the claim that she had a key, had entered the apartment, then called 911, was offered by the

13

Medical Legal Investigator, in a category of uncorroborated comments that she had heard. The game of telephone leads to garbled messages; so does sequential hearsay.
- *She died because of the combination of drugs; there was no but-for cause of death.*
  - She was walking, seemingly totally fine, at 12:50 pm. She ingested heroin and fentanyl around 1:30 or a bit earlier. She never moved after about 1:30 pm. Jones says she was unresponsive for 6-8 minutes before he left.
  - Walking fine at 12:50; comatose or dead an hour later? Because of opioids in combination with drugs and alcohol that she'd had at least eight hours before? Not plausible.
- *The dogs didn't eat her. So, she must have died well after the 5th, or else they'd have been hungry.*
  - The absence of evidence is not evidence. Do all dogs eat their owners after they die? Of course not. These were little dogs that loved her very much, and vice versa. They barked incessantly when the handyman arrived, when Felicia knocked at the door, when the police arrived. They were crying out for help for two straight days.
- *There were no dog droppings when the MLI photographed the scene. Therefore Diana must have walked the dogs. Or maybe Felicia did, using her supposed key.*
  - The police did not know how serious the crime scene was, when they were first investigating it. Indeed, initially they treated it as "another dead junkie," an accidental death. Are they going to preserve dog droppings as evidence, or are they going to toss them out, to avoid accidentally stepping on them during their investigation? No one even asked.
  - The Felicia suggestion was even more outlandish.
- *Was the untested black pill some lethal drug that she had, and took after Jones left?*
  - How many people have a pill pouch of some sort in their home? 95% of the population? A pill pouch doesn't mean illegal drugs. It just means a few pills.
  - The tested black pill was identified as Turmeric, a non-prescription supplement. Why should the lab test every pill in her apartment? They did test at least one of each type, after all. Why should the untested black pill have been any different from the identical black pill that was found to be Turmeric?
  - Isn't it more interesting that there were no illegal drugs, not even alcohol, in her apartment?
- *The security tapes, from around 2:30 pm on December 5 until noonish on December 7 were not preserved. What was the nefarious motive, and who didn't want them saved? Who knows who came and went during those 46 hours?*
  - Again, the police thought this was an accidental death until some weeks into their investigation. Why retain tapes from seemingly irrelevant times between the time Diana was last seen and the time when her body was found.
  - Had the tapes been preserved, and showed Diana neither coming nor going, while showing hundreds of other apartment denizens doing so, is there any doubt that the defense would still point to this lack of evidence as evidence?
- *The official documents list this as an accidental death. Now the prosecution wants to hang it on a guy who merely provided some opioids to Diana.*

14

- o C'mon ... the "accidental death" determination was preliminary, before any evidence other than the body had been examined.

I touch on these only because they bear on the issue of "reasonable doubt" versus "preponderance of the evidence." A juror might view these far-fetched alternative scenarios as not-impossible, therefore a basis for reasonable doubt. That said, it's hard for me to see any alternative scenario, as undercutting a "preponderance of the evidence" standard. The only plausible scenario is the obvious one: Michael Jones caused Diana's death.

**Conclusion**

I implore you to protect society. Michael Jones wasn't distributing a minor controlled substance like pot or ecstasy, nor a mid-tier substance like cocaine. He was distributing the strongest opioids money can buy, and was proud of their potency. While the jury may have not found his potent opioids to be the but-for cause of Diana's death, no one on the defense or prosecution would dispute the fact that opioids were a contributing cause of her death.

Nothing will bring Diana back. This isn't about retribution or avenging Diana's death. This is about *preventing the next death*.

If Michael Jones is released as soon as the guidelines would suggest, *the same guidelines as for pot distribution*, I fear he will be back dealing ultra-powerful opioids very, very soon. It's the only way he knows to make a decent living. I fear he will kill again reasonably soon. It may be inadvertent, but the mere act of selling a lethal product – knowing that the consequences may be death – is not much different from murder.

In Manhattan taxis, there's a placard that warns passengers that assaulting a taxi driver can lead to 25 years in jail. That's almost as preposterous as the defense recommendation to release Jones immediately, as he'd already been in jail for a year.

The defense alluded to race; race is irrelevant here. If Diana were black, and Jones was white, I would feel no differently: society must be protected. If Jones resumes distribution, the next death is likely to be in his circle of friends and acquaintances, most of whom are probably black. And, I fear this will happen shockingly soon. The New York – Philadelphia corridor loses over 3,000 people a year to opioid overdoses. I have no idea if this is one death per dealer per year, or more, or less. But, it will only be a matter of time, probably not long, before he kills again.

I would like to believe that the 16 months that he'll have been in prison by end-January will have taught him a lesson, and that he'll try to turn his life around, and embrace Diana's goal of making the world a better place, but I'm not especially optimistic. During the trial, he occasionally glanced back – never making eye contact with Diana's family and friends (most of whom traveled thousands of miles to attend the trial). Instead, he would exchange smirks with members of his family, then returning to presenting a hang-dog "poor me" look to the jury.

Despite lip-service from the defense, I don't see any evidence of remorse from the defendant, nor any willingness to accept responsibility for the consequences of his actions, either while he was watching Diana slip into unresponsive oblivion before his eyes, or afterwards.

I believe that, if Jones is put away for ten years or more – *just half the mandatory sentence associated with count 1B, and less than half the penalty for assaulting a taxi driver* – there will be two consequences.

Firstly, he will no longer have the connections to easily resume his drug dealing. He just might have to choose a different career. Secondly, jailhouse conversions – whether to religion, or to meditation, or to embrace new priorities for life – are not unknown. While I'm not optimistic, I'd love to learn that Jones, after some considerable span of reflection, decides that he can atone for his past mistakes, by seeking to do something positive for the world around him. That kind of redemption is not likely, but it is possible. It takes time.

Thank you, in advance, for considering our plea. Please protect society. Please prevent the next death from Jones's lethal concoctions. Please give him both the time and a reason to rethink his life choices. Maybe – just maybe – a good person can emerge from this terrible situation.

My remarks to the court will – I promise you! – be considerably shorter. I intend to address my remarks to the defendant, and will mostly focus on the positive choices he can make in the future. Please don't allow Diana's death to be dismissed, with a sentence that doesn't reflect the lethal consequences of Jones's life choices on Diana, and on everyone who knew and loved her.

                        Sincerely,

                        Robert D. Arnott
                        Father of the Victim

cc:    Daniel Wolf, Esq.
       United States Attorney's Office
       1 St. Andrew's Plaza
       New York, New York 10007