UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————

UNITED STATES OF AMERICA

      – against –              18-cr-662 (JGK)

MICHAEL JONES,                  <u>OPINION AND ORDER</u>

              Defendant.

————————————————————————————

JOHN G. KOELTL, District Judge:

The jury in this case found the defendant, Michael Jones, guilty of intentionally and knowingly distributing and possessing with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) – specifically, a quantity of mixtures and substances containing a detectable amount of heroin, fentanyl, and furanylfentanyl, in violation of 21 U.S.C. § 841(b)(1)(C). The defendant now moves for a judgment of acquittal notwithstanding the jury verdict pursuant to Federal Rule of Criminal Procedure 29(c)[1] and for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons explained below, the motion for judgment of acquittal is **granted.** The motion for a new trial is also conditionally **granted.**

———————————

[1] The defendant previously moved for a judgment of acquittal pursuant to Rule 29(a) at the close of the Government's case and renewed the motion after the defense rested; the Court denied the motion in each instance without prejudice. Tr. at 976-77, 1178-80.

On August 29, 2019, the Government filed a Superseding Indictment, charging the defendant with two counts of intentionally and knowingly distributing and possessing with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1). Count One charged that the activity occurred on or about December 5, 2017, and that the controlled substance involved was "a quantity of mixtures and substances containing a detectable amount of heroin, fentanyl, and furanylfentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(C)." Superseding Indictment ¶¶ 1-2. Count One also charged that the use of such controlled substance "resulted in the serious bodily injury and death of Diana Haikova on or about December 5, 2017 in Manhattan, New York, in violation of Title 21, United States Code, Section 841(b)(1)(C)." Superseding Indictment ¶ 3. Count Two charged that on or about February 14, 2018, the defendant distributed and possessed with intent to distribute a controlled substance, specifically, a "quantity of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(C)." Superseding Indictment ¶¶ 4-5.

On Count One, the jury found the defendant guilty of intentionally and knowingly distributing and possessing with

intent to distribute a controlled substance – specifically, a quantity of mixtures and substances containing a detectable amount of heroin, fentanyl, and furanylfentanyl. However, the jury did not find that the Government had proved that the use of the controlled substance – specifically, a quantity of mixtures and substances containing a detectable amount of heroin, fentanyl, and furanylfentanyl – resulted in the death of Diana Haikova. Trial Tr. ("Tr.") at 1401-04. The defendant pleaded guilty to Count Two during trial. Id. at 741-60.

The gist of the current defense motions is that the Government failed to prove beyond a reasonable doubt that the defendant distributed fentanyl and furanylfentanyl as well as heroin to Diana Haikova on December 5, 2017, and that the Court failed to provide the jury with an appropriate jury instruction. As explained below, the jury instruction was in fact the instruction that both the Government and the defendant requested, but the defense is correct that the Government failed to prove beyond a reasonable doubt that the defendant distributed fentanyl and furanylfentanyl as well as heroin to Diana Haikova on December 5, 2017.

**II.**

To succeed on a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, the defendant must show that no rational trier of fact, viewing the

evidence in the light most favorable to the Government, could have found the defendant guilty beyond a reasonable doubt of the essential elements of the crime charged. United States v. Desena, 287 F.3d 170, 176 (2d Cir. 2002). A defendant making an insufficiency claim "bears a very heavy burden." Id. at 177; see also United States v. Macklin, 927 F.2d 1272, 1277 (2d Cir. 1991) (collecting Second Circuit cases).

In considering the sufficiency of the evidence, the Court must "view the evidence presented in the light most favorable to the government, and . . . draw all reasonable inferences in its favor." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000). The Court must analyze the pieces of evidence "not in isolation but in conjunction," United States v. Matthews, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).

"[T]o avoid usurping the role of the jury," the Court must "not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury." Autuori, 212 F.3d at 111 (internal citation omitted). Thus, the Court must "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the

evidence." United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998). The jury's verdict "may be based entirely on circumstantial evidence." United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995); see also United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002); Macklin, 927 F.2d at 1277 (same); United States v. Sattar, 395 F. Supp. 2d 79, 82-83 (S.D.N.Y. 2005).

However, "[a] reasonable mind must be able to conclude guilt on each and every element of the charged offense." United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984). The Court of Appeals for the Second Circuit has emphasized that "where a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible." United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995). A court must "also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." Id. Courts "may not credit inferences within the realm of possibility when those inferences are unreasonable." United States v. Pauling, 924 F.3d 649, 657 (2d Cir. 2019) (citing United States v. Quattrone, 441 F.3d 153, 169 (2d Cir. 2006)).

Construing the evidence in the light most favorable to the Government, the evidence at trial showed the following:

In December, 2017, William Gable went to Long Beach, New York for the memorial service of a friend; during that time, he met Diana Haikova. Id. at 713-15. For several days following the memorial service, Gable spent time with Haikova and saw her use party drugs like cocaine. Id. at 717. In the early hours of December 5, 2017, Gable and other individuals, including Haikova, went to a music studio. Id. at 719-21. Gable stated that he witnessed Haikova use cocaine at the studio and that he also saw Xanax at the studio. Id. at 726-27. He also testified that he obtained heroin from the defendant at the studio. Id. at 727. Gable, who had a high tolerance for heroin at the time, testified that the heroin from the defendant was "the best that [he] could get [his] hands on." Id. at 722-23, 725.

On December 5, 2017, the defendant accompanied Haikova to her apartment in Chelsea. Govt. Ex. 100. The part-time doorman at Haikova's apartment testified that they arrived at around 12 to 12:30 p.m. Tr. at 155. In a recorded post-arrest statement submitted into evidence as Government Exhibit 300, the defendant admitted to giving Haikova heroin at her apartment on December 5, 2017. Govt. Ex. 301-D; Tr. at 891. He described and

6

demonstrated Haikova's physical reaction to the heroin to the investigators. Id. at 891-94. However, he stated that he "did not know [the substance given to Haikova] was fentanyl." Govt. Ex. 301-D. The building manager testified that based on the surveillance videos, the defendant left the apartment approximately two hours after the defendant arrived. Tr. at 138.

In the early evening of December 5, 2017, Carlos Borbon, a handyman for Haikova's apartment building, id. at 158, entered Haikova's apartment to change a water filter, id. at 170. He testified that he saw the back of Haikova and thought she was sleeping. Id. at 163, 169. Borbon did not speak to Haikova and only stayed in Haikova's apartment for about a minute. Id. at 162-63. He had checked out the key card for Haikova's apartment from the front desk on December 5, 2017 at 6:17 p.m. and returned it on that same day at 10:09 p.m. Id. at 125; Govt. Ex. 201.

On December 7, 2017, law enforcement officers performed a wellness check at Haikova's apartment. Id. at 79-81, 188. Haikova was pronounced dead at the scene by medical professionals at 1:50 p.m. on December 7, 2017. Id. at 528-29, 541; Govt. Ex. 503.

In February, 2018, Gable made two recorded calls to the defendant, which were admitted into evidence as Government

Exhibits 401 and 402.[2] Id. at 786-88. During the first call,
Gable stated that he could not "find nobody with the actual like
good shit, Bro," id. at 794 and that the defendant was the only
one he trusted "when it [came] to getting that good dope," or
high-quality heroin, which Gable referred to as "doop doop
doop," id. at 795. On the call, Gable and the defendant arranged
for the defendant to bring Gable heroin in February, 2018. Id.
at 798.

The parties stipulated that on or about February 14, 2018,
the defendant knowingly and intentionally distributed a
controlled substance, namely heroin, to Gable. Id. at 972-73.
Through a controlled buy, Gable purchased twelve bags, each
containing a powdery substance. Id. at 811-12, 954-55. The
substances were tested by the New York Police Department Police
Laboratory, which determined that the substances contained
approximately 0.485 grams of heroin with a purity level of 84%.
Id. at 955; Govt. Ex. 604. Detective Al Hernandez, the
Government's expert in the sale and methods of drug trafficking
in the New York metropolitan area, testified that the heroin
that he typically encounters in his investigations has a purity
level ranging from about 20% to 70%. Id. at 947, 967-68. He

---

[2] Government Exhibits 401 and 402 were recorded calls made on February 8, 2018
and February 13, 2018, respectively. Tr. at 831, 874.

stated that heroin with an 84% purity level is extremely potent. Id. at 968.

While the evidence is clear that the defendant distributed heroin to Haikova on December 5, 2017, there is no direct evidence that he also distributed fentanyl and furanylfentanyl to the victim on that date or that the heroin distributed by the defendant was mixed with fentanyl and furanylfentanyl. Rather, the Government attempts to rely on inferences from the toxicology findings and some testimony of its expert medical toxicologist, Dr. Stacey Hail, which is contrary to the findings of the Office of the Chief Medical Examiner of the City of New York and the defense experts.

A toxicology report prepared in connection with Haikova's autopsy listed the following substances and amounts in her femoral blood:[3]

| | |
|---|---|
| Ethanol | 0.26 g% |
| Fentanyl | 0.25 ng/mL |
| Furanylfentanyl | 0.79 ng/mL |
| 4-ANPP | 13 ng/mL |
| Methylenedioxymethamphetamine | 0.12 mg/L |
| Methylenedioxyamphetamine | detected |
| Cocaine | <50 ng/mL |
| Ethylbenzoylecgonine | <50 ng/mL |
| Benzoylecgonine | 299 ng/mL |
| Morphine | 56 ng/mL |
| 6-monoacetylmorphine | detected |
| Alprazolam | 7.3 ng/mL |

---

[3] Fonseca testified that "femoral blood is collected from the femoral vein located in the lower portion of the body, usually the leg." Tr. at 473. Dr. Georgievskaya testified that medical examiners "prefer to test femoral blood because it's a gold standard for postmortem toxicology." Id. at 519.

Govt. Ex. 502. Throughout the trial, various experts opined on the presence of the different substances and their amounts in the toxicology report. These experts included (1) Dr. Zhanna Georgievskaya, the medical examiner with the Office of the Chief Medical Examiner of the City of New York, who performed the autopsy on Haikova, Tr. at 508-09, and also testified as the Government's expert in forensic pathology, (2) Dr. Stacey Hail, the Government's expert in medical toxicology, (3) Dr. Cyril Wecht, the defendant's expert in forensic pathology, and (4) Dr. Robert Middleberg, the defendant's expert in forensic toxicology. Reinaldo Fonseca, assistant director of forensics toxicology at the Office of the Chief Medical Examiner of the City of New York, prepared the toxicology report, id. at 466, 476, and also testified about the results.[4]

The substances in the toxicology report that relate to the distribution of heroin, fentanyl, and furanylfentanyl include fentanyl, furanylfentanyl, 4-ANPP, morphine, and 6-monoacetylmorphine ("6-MAM"). Fentanyl is a parent compound; furanylfentanyl is an opioid analog[5] of fentanyl. Id. at 479

---

[4] Fonseca also testified that substances that enter the body may be "parent compounds," and break down through the process of metabolism into metabolites; these metabolites are the equivalent of the "parent" compound's "children." Tr. at 478-79.

[5] Amanda McGettigan, a criminalist at the New York City Police Department Laboratory, testified that in the context of controlled substances, an analog is a compound that is very similar to another compound, but is just somewhat different in its chemical structure. Tr. at 201-02, 207. Hernandez testified that analogs are derivatives of the original compound, and "are off by a ring or some type of chemical in their structure." Id. at 960. Analogs of fentanyl

(Fonseca), 642 (Dr. Hail). Fonseca testified that 4-ANPP is a metabolite, but is also used in the preparation of fentanyl. Id. at 479. Dr. Hail testified that 4-ANPP is not a metabolite, and is used to make fentanyl. Id. at 642. Dr. Middleberg testified that 4-ANPP is a metabolite of fentanyl found in humans after they ingest fentanyl. Id. at 1095. Dr. Wecht testified that the literature indicated that fentanyl deaths can begin with as little as 3 ng/mL detected in the blood, and that he had seen other deaths caused by a range of 5-15 ng/mL;[6] comparatively, the 0.25 ng/mL of fentanyl in Haikova's blood indicated in the toxicology report was a relatively low level. Id. at 1029-30. Dr. Middleberg testified that the amounts of fentanyl in Haikova's bloodstream were too low for "somebody to get a therapeutic effect." Id. at 1094. Dr. Middleberg also testified that the amount of furanylfentanyl in Haikova's bloodstream was on the low side, compared to levels in other deaths due to furanylfentanyl. Id. at 1094-95.

The experts generally agreed that heroin resides in the human body for a very short amount of time after ingestion because it metabolizes very quickly; it is therefore rarely

---

are produced as "designer drug[s]," for reasons such as avoiding state laws, by altering the drug's composition or chemical structure to be different from that of a controlled substance, and changing the purity or potency of the drug. Id.

[6] A nanogram is "a unit of mass equal to one billionth of a gram." Webster's Third New Int'l Dictionary at 1501. 0.25 ng is one quarter of a nanogram.

detected in the femoral blood in a toxicological report. Id. at
482-83 (Fonseca), 521 (Dr. Georgievskaya), 649 (Dr. Hail).
Heroin metabolizes into morphine and 6-MAM. Id. at 482
(Fonseca), 1087 (Dr. Middleberg) (stating that heroin converts
to 6-MAM, which then converts to morphine). Morphine is a
compound that can be taken on its own. Id. at 522 (Dr.
Georgievskaya). 6-MAM is a marker for heroin, because it is a
metabolite of only heroin and nothing else; therefore, the
presence of morphine and 6-MAM in the blood indicates that the
morphine was metabolized from heroin. Id. at 482 (Fonseca), 521-
22 (Dr. Georgievskaya), 650 (Dr. Hail). The half-life[7] of 6-MAM
is also very short, and is known to be about 6 to 25 minutes.
Id. at 483 (Fonseca), 649 (Dr. Hail). On the toxicology report,
6-MAM was labeled as "detected," and did not include a quantity.
According to Fonseca, substances are labeled "detected" when gas
chromatography-mass spectrometry screening tests are able to
establish that the substance is present in the blood, but the
amount of the substance present does not meet the "cutoff" for a
quantity to be listed. Id. at 480. Dr. Middleberg testified that
because laboratory methods can detect "exquisitely low
concentrations of a substance," "many hours can go by before you
can no longer detect 6-MAM." Id. at 1088. Dr. Hail testified

---

[7] Fonseca testified that the half-life "is the time it requires for a drug to
come to 50 percent [its] value." Tr. at 482-83.

that heroin has about 1.5 – 2.5 times the potency of morphine taken orally, and that fentanyl has 100 times the potency of morphine taken orally. Id. at 642. She stated that furanylfentanyl is a pretty new substance, but preliminary studies place its potency probably around the same as fentanyl. Id.

Hernandez testified that fentanyl and furanylfentanyl are commonly used in the milling of heroin.[8] Id. at 959-64. Hernandez also testified that milling heroin with fentanyl and furanylfentanyl has become mainstreamed and that the addition of fentanyl or a fentanyl analog significantly increases the potency of the heroin. Id. at 961-62. At various points, witnesses also acknowledged that fentanyl can be mixed with other substances, like ecstasy, Xanax, and cocaine. Id. at 913 (Mannick), 1017 (Dr. Wecht), 1093 (Dr. Middleberg). Hernandez also testified that fentanyl can be pressed into pill form so that it looks like "a solid regular pill like . . . an aspirin pill"; individuals may ingest or crush the fentanyl pill under the belief that it is a different pill, such as Oxycodone. Id. at 964-65.

The remaining detected substances listed in the toxicology report were ethanol, methylenedioxymethamphetamine,

---

[8] Hernandez testified that "milling" means to crush, prepare, and add additives or adulterants to a drug. Tr. at 948. These adulterants can include propane, caffeine, fentanyl, and other types of opioids. Id.

methylenedioxyamphetamine, cocaine, ethylbenzoylecgonine, benzoylecgonine, and alprazolam. Ethanol may be found in the body after consuming alcohol. Id. at 478 (Fonseca), 637 (Dr. Hail). Methylenedioxymethamphetamine, or MDMA, is known as ecstasy. Id. at 480 (Fonseca), 550 (Dr. Georgievskaya), 643 (Dr. Hail). Methylenedioxyamphetamine, or MDA, can be ingested on its own, and is also a minor metabolite of ecstasy. Id. at 480 (Fonseca), 521 (Dr. Georgievskaya), 643 (Dr. Hail). Cocaine is a parent compound. Id. at 480 (Fonseca), 521 (Dr. Georgievskaya). Ethylbenzoylecgonine is a metabolite that is produced in the body from the interaction of cocaine and ethanol. Id. at 481 (Fonseca), 521 (Dr. Georgievskaya), 655 (Dr. Hail). Benzoylecgonine is a metabolite of cocaine. Id. at 481 (Fonseca), 521 (Dr. Georgievskaya), 654 (Dr. Hail). Alprazolam is also known as Xanax. Id. at 482 (Fonseca), 522 (Dr. Georgievskaya), 651 (Dr. Hail).

Dr. Georgievskaya opined that the cause of Haikova's death was acute intoxication by the combined effects of fentanyl, furanylfentanyl, heroin, cocaine, MDMA, Xanax, and alcohol. Id. at 554-55. Dr. Wecht agreed completely with Dr. Georgievskaya's analysis and testimony regarding Haikova's cause of death. Id. at 1003-04. Dr. Hail alone testified that the but-for cause of death was fentanyl, furanylfentanyl, and heroin. Id. at 659. She testified that heroin is commonly tainted with fentanyl and

fentanyl analogs, so it was a "reasonable conclusion" that the heroin that Haikova ingested had one of these substances – fentanyl and furanylfentanyl. Id. She also testified that because 6-MAM has a relatively short half-life, she rarely sees 6-MAM in the blood in heroin overdoses, since it "may take a little bit longer to die from heroin because it's not as potent." Id. She continued, "[p]robably I am seeing 6-MAM here because fentanyl and furanylfentanyl are present too, which cause death to happen much faster." Id. She also stated that fentanyl and furanylfentanyl would not "stick around" and cause death a couple days later, but, rather, would cause death within minutes of their administration. Id. at 659-60. She analogized the use of fentanyl to getting struck by lightning, because "you don't get struck by lightning and then drop dead two days later." Id. at 659. Rather, if someone takes fentanyl and continues to carry on their day, then they're not dying from fentanyl. Id. She therefore stated that "the reasonable conclusion" was that the fentanyl, furanylfentanyl, and heroin "were present together." Id. at 660. Dr. Hail acknowledged that an individual can die from heroin alone, but thought that fentanyl caused the death rapidly in this case, in part because there were no metabolites of fentanyl, such as norfentanyl, present in the toxicology report. Id.

Other experts gave differing opinions on the estimated time of death. Dr. Georgievskaya noted that the time of death would be difficult to estimate, but that a range of the time of death was 24 hours (give or take 12 hours) before Haikova was found. Id. at 543-46. Dr. Wecht opined that the time of death was 24 to 36 hours prior to the time that she was found. Id. at 1019-25. Because Dr. Georgievskaya and Dr. Wecht's estimated time of death ranged from 12 to 36 hours before Haikova was found and Haikova was found dead on December 7, 2017 at 1:50 p.m., the time of death estimated by Dr. Georgievskaya and Dr. Wecht was sometime between early December 6 or early December 7; this was inconsistent with Dr. Hail's testimony that Haikova died quickly on the afternoon of December 5.

**B.**

The trial in this case began on October 11, 2019. On October 23, 2019, the Court held a conference to discuss a draft set of jury instructions. The initial draft of the jury charge for Count One instructed the jury that the Government needed to prove beyond a reasonable doubt only that the controlled substance at issue was heroin, fentanyl, or furanylfentanyl. Id. at 1107-08. However, the Court amended the charge to state that the Government needed to prove beyond a reasonable doubt that the controlled substance at issue was mixtures and substances containing heroin, fentanyl, and furanylfentanyl. Id. at 1108-

16

11. This change was made at the Government's request, with the defendant's agreement, and after giving parties time to confer. Id. The Court specifically noted that the Government's requested instruction would result in "a more favorable charge to the defendant than the one that [the Court] had drafted." Id. at 1107-08. Both parties agreed that the amended charge was correct. Id. at 1108-09.

On Thursday, October 24, 2019, the Court charged the jury. In relevant part, the Court explained the Government's burden with respect to Count One's allegations of narcotics distribution as follows:

> The Government must prove beyond a reasonable doubt that the material the defendant is charged with possessing was, in fact, a controlled substance; namely, mixtures and substances containing heroin, fentanyl and furanylfentanyl. As I've instructed you, heroin, fentanyl and furanylfentanyl are all controlled substances. You must all be unanimous that the defendant possessed mixtures and substances containing heroin, fentanyl and furanylfentanyl.

Id. at 1294 (emphases added). On October 25, 2019, during deliberations, the jury submitted a question regarding the elements of the charge and the verdict form. Id. at 1361-62. To answer the jury's question, the Court conferred with the lawyers and drafted a response, which was marked as Court Exhibit 22. Id. at 1372. Court Exhibit 22 stated, in relevant part,

> Before the defendant can be convicted of the
> offense charged in Count One, you must all be
> unanimous that the Government has proven
> beyond a reasonable doubt each of the three
> elements of that offense as I have explained
> those elements to you, including that the
> material that the defendant is charged with
> possessing was, in fact, a controlled
> substance, namely, mixtures and substances
> containing heroin, Fentanyl, and
> Furanylfentanyl.

Id. at 1373 (emphasis added).

## IV.

### A.

The defendant first argues that the Court incorrectly instructed the jury on Count One and lowered the Government's burden of proof. In his motion papers, the defendant claimed that the Court instructed the jury that the Government needed to prove beyond a reasonable doubt only that the controlled substance at issue was heroin, fentanyl, or furanylfentanyl, when the jury should have been instructed that the controlled substances at issue were heroin, fentanyl, and furanylfentanyl.

At the argument of the current motions, defense counsel conceded that his objection to the charge was mistaken. January 15, 2020 Tr. at 2-3. As the record clearly reflects, the Court did in fact require the jury to find that the defendant distributed or possessed with intent to distribute mixtures and substances containing all three controlled substances. At the

charge conference, the Court modified its original proposed
instruction that the Government need only prove possession of
any one of the three controlled substances; the Court did so at
the Government's request and with the defendant's agreement.[9] On
October 24, 2019, the Court instructed the jury that the
Government had to prove beyond a reasonable doubt, that the
"material the defendant is charged with possessing was, in fact,

---

[9] Count One of the Superseding Indictment in this case charged the defendant
with one count of distribution or possession with intent to distribute a
controlled substance. "The controlled substance involved in the offense was a
quantity of mixtures and substances containing a detectable amount of heroin,
fentanyl, and furanylfentanyl . . . ." Superseding Indictment ¶ 2. In its
original instruction, the Court proposed to charge that the jury needed to
find that the Government proved beyond a reasonable doubt that the controlled
substance at issue was heroin, fentanyl, or furanylfentanyl. This is because
"[w]here there are several ways to violate a criminal statute. . . federal
pleading requires . . . that an indictment charge [be] in the conjunctive to
inform the accused fully of the charges. A conviction under such an
indictment will be sustained if the evidence indicates that the statute was
violated in any of the ways charged." United States v. Mejia, 545 F.3d 179,
207 (2d Cir. 2008) (citation omitted). Where "there is charged a single
offense of possession with intent to distribute a controlled substance, which
offense involved (a) . . . and (b)," "[e]ither (a) or (b) could form the
basis for conviction." United States v. McCourty, 562 F.3d 458, 471 (2d Cir.
2009) (internal quotation marks omitted) (emphasis in original). Under the
schedules of controlled substances effective in December, 2017, heroin,
fentanyl, and furanylfentanyl are all controlled substances. See 21 U.S.C.
§ 812; 21 CFR § 1308.11 (Schedule I); 21 CFR § 1308.12 (Schedule II).

After explicitly noting that the Government's requested instruction was more
favorable to the defendant than what the Court required in its original
instruction and providing the Government with time to confer, the Court
agreed to the Government's request to amend the charge and inserted "and" in
place of "or." At the argument of the current motions, the Government stated
that the Court's original instruction, with "the 'or' disjunctive between the
three [controlled substances] was legally correct." January 15, 2020 Tr. at
32. The Government explained its rationale for asking for a more demanding
charge than the law required as follows: "The government believed . . . that
the evidence established there was only one source of these three drugs and
that source was the defendant. And it argued it that way to the jury." Id.
However, as explained below, while the evidence was clear that the defendant
distributed heroin to Haikova on December 5, no reasonable jury could have
found that the Government proved beyond a reasonable doubt that the defendant
also distributed fentanyl and furanylfentanyl on December 5.

a controlled substance; namely, mixtures and substances containing heroin, fentanyl and furanylfentanyl." Id. at 1294. In addition, when the Court responded to one of the jury's questions during deliberations, the Court again instructed the jury that in order to return a verdict of guilty, the jury needed to find unanimously that the Government had proved beyond a reasonable doubt that "the material that the defendant is charged with possessing was, in fact, a controlled substance, namely, mixtures and substances containing heroin, Fentanyl, and Furanylfentanyl." Id. at 1373.

Therefore, the defendant's argument that the Court erred in providing the jury instruction has no merit.

**B.**

The defendant next challenges the sufficiency of the Government's evidence that the defendant actually distributed mixtures and substances containing heroin, fentanyl, and furanylfentanyl on December 5, 2017.

The evidence submitted to the jury at trial established beyond a reasonable doubt that the defendant distributed heroin on December 5, 2017. The defendant himself admitted in his post-arrest statement that he distributed heroin to Haikova on or about December 5, 2017. Id. at 891. He described and demonstrated her physical reaction to the heroin to the investigators. Id. at 891-94.

However, no direct testimony established that the defendant distributed heroin laced with fentanyl and furanylfentanyl on December 5, 2017. The defendant stated that he did not know the substance given to Haikova was fentanyl. Govt. Ex. 301-D. Furthermore, Gable testified that he had received heroin from the defendant at the studio, in the early morning of December 5, 2017. Through the series of recorded calls, Gable set up another purchase in February, 2018, to get that same "good dope," or the defendant's high-quality heroin. Id. at 795. On the call, Gable mentioned that he could not find anybody else with the "good shit" that the defendant had. Id. at 794. In accordance with their conversations, on February 14, 2018, the defendant distributed to Gable twelve bags of substances. But these substances contained only heroin that had a purity level of 84% and that was not adulterated with any other opioid. No witness ever testified that the drugs the defendant distributed were ever mixed with fentanyl or furanylfentanyl on any occasion; Gable did not testify that on either occasion of his receiving drugs from the defendant, the drugs distributed contained fentanyl or furanylfentanyl. And there was no evidence to show that the defendant had any reason to adulterate the heroin he distributed with fentanyl or furanylfentanyl. The heroin he distributed to Gable, the only heroin distributed by the defendant that was tested, had a high purity level of 84%. Tr.

at 968; Govt. Ex. 604. Hernandez testified that fentanyl and furanylfentanyl, which have a much higher potency than heroin, are added to heroin and increase its potency. Tr. at 962. The defendant was distributing pure, unadulterated heroin with a high potency and whose purity level was already higher than the typical purity levels Hernandez had seen in his investigations.

Even without direct evidence that the heroin that the defendant gave to Haikova contained fentanyl and furanylfentanyl, the jury could rely on circumstantial evidence if that evidence was sufficient to prove beyond a reasonable doubt that the heroin the defendant provided was in fact mixed with fentanyl and furanylfentanyl. One piece of circumstantial evidence submitted to the jury was that several experts testified that fentanyl and furanylfentanyl are commonly milled with heroin to make the product stronger. However, the experts acknowledged that fentanyl can also be used to adulterate Xanax, ecstasy, and cocaine, and the toxicology report showed that Xanax, ecstasy, and cocaine, and their metabolites, were found in Haikova's blood. Moreover, Hernandez testified that fentanyl can, on its own, be pressed like a pill to look like aspirin or Oxycodone. While a jury could conclude that fentanyl and furanylfentanyl are used to adulterate heroin, the expert testimony could not establish beyond a reasonable doubt that the heroin distributed by the defendant in this instance was milled

with fentanyl and furanylfentanyl. Furthermore, there was no expert testimony in this case as to when the fentanyl and furanylfentanyl were consumed by Haikova and the amounts of fentanyl and furanylfentanyl found in Haikova's femoral blood were exceedingly small.

The only additional circumstantial evidence that the jury could rely on to conclude that the defendant's heroin also contained fentanyl and furanylfentanyl was Dr. Hail's testimony. Dr. Hail concluded that the heroin the defendant distributed had to have been mixed with fentanyl and furanylfentanyl because fentanyl is so strong that it would cause death within minutes of its administration, whereas it "may take a little bit longer to die from heroin because it's not as potent." Id. at 659. She also concluded that death occurred quickly because (1) 6-MAM, which is a metabolite of heroin, was still present in Haikova's blood at the time of the autopsy despite its relatively short half-life and (2) no fentanyl metabolites were present in the blood, suggesting that death occurred quickly before fentanyl could be metabolized. Dr. Hail therefore found that Haikova must have died quickly from the administration of heroin, fentanyl, and furanylfentanyl together, despite the fact that she acknowledged that someone could die from heroin alone.

Dr. Hail's conclusion that Haikova must have died within minutes from her ingestion of fentanyl and furanylfentanyl was

contradicted by Dr. Georgievskaya, the medical examiner who performed the autopsy and the Government's expert forensic pathologist, who estimated that Haikova's time of death was likely 24 hours, give or take 12 hours, from the time she was found, and by Dr. Wecht, the defendant's expert forensic pathologist, who estimated that Haikova's time of death was 24 to 36 hours before the time she was found.

In addition, Dr. Hail based her finding that fentanyl caused death rapidly in this case on the fact that 6-MAM was still present in the blood and on the fact that she did not see any metabolites of fentanyl, like norfentanyl, present in the toxicology report. However, there was no quantity attached to the amount of 6-MAM present in the toxicology report, and Dr. Middleberg testified that many hours could go by before laboratories could no longer detect 6-MAM. Further, Fonseca and Dr. Middleberg testified that 4-ANPP is a metabolite of fentanyl, and 4-ANPP was present in Haikova's blood. While fentanyl is an extremely powerful drug, Dr. Wecht testified that based on the scientific literature, deaths from fentanyl usually start at 3 ng/mL. The level of fentanyl in Haikova's blood was only 0.25 ng/mL, which Dr. Middleberg testified was too low to even have any therapeutic effect. Dr. Hail provided no analysis of the quantity of fentanyl and furanylfentanyl that Haikova allegedly took with the heroin and how that translated into the

exceedingly small amounts reflected in the toxicology report. This is particularly troubling because Haikova went to her apartment with the defendant soon after being at a studio where she consumed at least cocaine, and when she had ecstasy and Xanax, which are also known to be mixed with fentanyl, in her system.

While the Court must credit the jury's choice of competing inferences that can be drawn from the evidence, the Court should avoid viewing the pieces of evidence in isolation. Taking all of the evidence in the light most favorable to the Government and drawing all reasonable inferences in its favor, no reasonable jury could have believed that Dr. Hail's testimony established beyond a reasonable doubt that the defendant distributed fentanyl and furanylfentanyl on December 5, 2017.[10] There was no direct evidence that the defendant distributed fentanyl or furanylfentanyl on any occasion. Instead, the Government's case requires the inference that fentanyl and furanylfentanyl must have been distributed with the heroin and administered together to Haikova in the early afternoon of December 5, 2017; this inference is supported only by limited circumstantial evidence that is insufficient to dispel the reasonable doubt of a reasonable factfinder. As discussed above, the evidence

---

[10] The jury rejected Dr. Hail's opinion that the combination of heroin, fentanyl, and furanylfentanyl was the "but-for" cause of Haikova's death. Tr. at 1402.

presented at trial showed that (a) the defendant had distributed only heroin to Gable on February 14, 2018, after Gable requested the same drugs as he received on December 5, 2017 at the studio and (b) Dr. Hail's conclusion that Haikova died in the early afternoon of December 5, 2017 from fentanyl and furanylfentanyl as well as heroin, is completely speculative, given evidence of the forensic pathologists' estimates of Haikova's time of death, the different opinions as to how long 6-MAM can be detected in the blood, the presence of a fentanyl metabolite in Haikova's system, and the minimal amount of fentanyl and furanylfentanyl in Haikova's system compared to the amount present in other fentanyl and furanylfentanyl-related deaths. The inferences made by Dr. Hail – that death occurred quickly and was thus caused by the fentanyls - was speculative and insufficient to support a conviction beyond a reasonable doubt. The evidence, at best, is equivocal as to when the fentanyl and furanylfentanyl entered Haikova's system and is therefore also equivocal that the controlled substance that the defendant distributed was mixtures and substances containing heroin, fentanyl, and furanylfentanyl. Accordingly, the defendant's motion for judgment of acquittal is **granted.**

**V.**

When a court grants a Rule 29 motion made concurrently with a Rule 33 motion, "the court must also conditionally determine

whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed . . . [and] specify the reasons for that determination." Fed. R. Crim. P. 29(d)(1); see United States v. Pauling, 256 F. Supp. 3d 329, 339 (S.D.N.Y. 2017), aff'd and remanded, 924 F.3d 649 (2d Cir. 2019).

Rule 33 of the Federal Rules of Criminal Procedure provides that the trial court may grant a defendant's motion for a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The standard for a motion pursuant to Rule 33 of the Federal Rules of Criminal Procedure based on an alleged insufficiency of the evidence is, like the standard for a motion pursuant to Rule 29, an exacting one. A court will grant a new trial only "in the most extraordinary circumstances." United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (citing United States v. Imran, 964 F.2d 1313, 1318 (2d Cir. 1992)). In evaluating the sufficiency of the evidence for purposes of Rule 33, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (internal citation omitted). There must be "a real concern that an innocent person may have been convicted." Id. While the Court has "broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," it must

nonetheless "exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." Id. (internal citation and quotation marks omitted); see also Sattar, 395 F. Supp. 2d at 83.

Taking an objective evaluation of the evidence as outlined above, the Government did not prove beyond a reasonable doubt that the defendant distributed fentanyl and furanylfentanyl on December 5, 2017. There was no direct evidence that the heroin that the defendant provided Haikova was adulterated with fentanyl and furanylfentanyl. Viewing the lack of support for Dr. Hail's testimony and the inconsistencies between Dr. Hail's testimony and the testimony of all the other experts and the other evidence provided at trial, as detailed above, no reasonable jury could find beyond a reasonable doubt that the defendant distributed all three controlled substances on December 5, 2017. Accordingly, the court conditionally grants the defendant's Rule 33 motion. In the event that the Court of Appeals vacates or reverses the Court's ruling on the Rule 29 motion, the defendant would be entitled to a new trial on Count One.[11]

---

[11] The portion of Count One that would be subject to a new trial is contained in paragraphs 1 and 2 of the Superseding Indictment.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. The defendant's motion for judgment of acquittal notwithstanding the jury verdict pursuant to Rule 29 on Count One is **granted.** In the alternative, the defendant's motion for a new trial on Count One pursuant to Rule 33 is **granted.** The Clerk is directed to close all pending motions.

**SO ORDERED.**

**Dated:     New York, New York**
**          January 22, 2019**                    _/s/ John G. Koeltl_
                                           **John G. Koeltl**
                                 **United States District Judge**